

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the order of the Court.**

**Signed June 30, 2005**

*Om a. Feberth*

**United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| NETWORK STAFFING SERVICES, | § | CASE NO. 02-35608-SAF-11 |
| INC., | § | |
|     DEBTOR. | § | |
| _____ | § | |
| NETWORK STAFFING SERVICES, INC. | § | |
| LIQUIDATING TRUST, | § | |
|     PLAINTIFF, | § | |
| | § | |
| VS. | § | ADVERSARY NO. 04-3388 |
| | § | |
| JENKENS & GILCHRIST, | § | |
| A PROFESSIONAL CORPORATION, | § | |
|     DEFENDANT. | § | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Doug G. Dyer, the trustee of the Network Staffing Services, Inc. ("NSSI") Liquidating Trust, seeks to recover $404,000 from the defendant, Jenkens & Gilchrist, P.C., ("J&G") as either preferential or fraudulent transfers under 11 U.S.C. §§ 544, 547, 548, and 550. J&G responds that it provided new value as a defense to any preferential transfer, that NSSI had not been

insolvent, and that J&G provided reasonably equivalent value in exchange for the transfers.

Actions to avoid transfers as preferences or fraudulent conveyances constitute core matters over which this court has jurisdiction to enter a final judgment. 28 U.S.C. §§ 157(b)(2)(F) and (H) and 1334. This memorandum opinion contains the court's findings of fact and conclusions of law. Bankruptcy Rule 7052. The court conducted a trial of this adversary proceeding on May 16 and 17, 2005.

On July 1, 2002, NSSI filed a petition for relief under Chapter 11 of the Bankruptcy Code. On August 9, 2002, the United States Trustee appointed an official creditors' committee. On January 3, 2003, the court appointed a Chapter 11 trustee. On October 3, 2003, the committee filed a fourth amended liquidation plan with a corresponding disclosure statement. Under the plan, remaining estate assets, including causes of action under the Bankruptcy Code, were transferred to a liquidating trustee, to liquidate and distribute the assets to creditors. On December 5, 2003, the court confirmed that plan. Dyer presently serves as the liquidating trustee.

In 1999, a dispute arose between Michael and Deborah Logal and Richard Blumberg, all shareholders of NSSI. Blumberg acted through his corporation, Stasan, Inc. The dispute resulted in state and federal litigation involving the shareholders, Piotr Zapendowski, and NSSI. The Logals retained the services of J&G.

The Logals, as control persons of NSSI, subsequently caused NSSI to also retain the services of J&G. NSSI paid J&G approximately $404,000 in the two and one-half years preceding the bankruptcy filing, of which $68,183.80 had been paid during the preference period. Dyer contends that NSSI had been insolvent during the entire year preceding its bankruptcy petition. Dyer further contends that J&G provided legal services to the Logals to defend the shareholder control dispute with Stasan. As a result, Dyer maintains that J&G provided value to the Logals, not to NSSI. Without value to NSSI, Dyer seeks to recover the transfers. The court first addresses the fraudulent conveyance claims, then the preference claims.

## Legal Fees and Expenses

At trial, Dyer requested that the court consider avoiding transfers from NSSI to J&G that paid for prior legal services and reimbursed J&G for out of pocket expenses. J&G contends that Dyer must be limited to recover legal fees paid to J&G. Dyer's first amended complaint references only the recovery of legal fees, without mentioning costs or expenses. The court denied a motion to file a further amended complaint to add the recovery of costs and expenses, holding that the court would consider a trial amendment. Dyer moved the court for a trial amendment. Because of the nature of the fraudulent transfer issues, the court grants the trial amendment. The court should consider whether Dyer has

-3-

established that J&G did not provide reasonably equivalent value
to NSSI for both the services and expenses paid by NSSI.  The
court therefore considers that transfers totaling $404,096.38 are
subject to the fraudulent transfer claims.  On the other hand,
the nature of the preferential transfer issues compels the court
to deny the trial amendment.  Dyer did not present evidence
addressing the cost component of the transfers during the
preference period.  Consequently, J&G did not present evidence of
defenses to any avoidance attack to the reimbursement of
expenses.  A trial amendment would therefore be improper.
Consequently, even though Dyer asks the court to avoid a total of
$68,183.80 during the preference period, the court actually
limits its consideration to the legal fee component of
$51,247.30.

### Constructive Fraud

Section 548(a)(1)(B) of the Bankruptcy Code provides:

(a)(1) The trustee may avoid any transfer of an
interest of the debtor in property, or any obligation
incurred by the debtor, that was made or incurred on or
within one year before the date of the filing of the
petition, if the debtor voluntarily or involuntarily-
(B)(I) received less than a reasonably equivalent
value in exchange for such transfer or obligation; and
(ii)(I) was insolvent on the date that such transfer
was made or such obligation was incurred, or became
insolvent as a result of such transfer or obligation;
(II) was engaged in business or a transaction, or was
about to engage in business or a transaction, for which
any property remaining with the debtor was an
unreasonably small capital; or
(III) intended to incur, or believed that the debtor
would incur, debts that would be beyond the debtor's

-4-

ability to pay as such debts matured.

11 U.S.C. § 548(a)(1)(B)(2002). According to this provision, the court must determine, from the perspective of the transferor, that no great disparity exists between the value of goods or services exchanged. Sherman v. FSC Realty LLC (In re Brentwood Lexford Partners, LLC), 292 B.R. 255, 267 (Bankr. N.D. Tex. 2003).

The trustee may also avoid any transfer of an interest of the debtor in property that is avoidable under applicable law by a creditor holding an allowed unsecured claim. 11 U.S.C. § 544(b). Known as the strong arm provision of the Bankruptcy Code, § 544 "allows the trustee to step into the shoes of a creditor for the purpose of asserting causes of action under state fraudulent conveyance laws and confers on the trustee the status of a hypothetical creditor or bona fide purchaser as of the commencement of the case." In re Zedda, 103 F.3d 1195, 1201 (5th Cir. 1997).

Section 24.006 of the Texas Business and Commerce Code provides:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.
> (b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt,

-5-

the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

Tex. Bus. & Com. Code Ann. § 24.006 (Vernon 2002).

## **Existing Creditor**

Zapendowski testified that, as a result of a consulting agreement and a promissory note, he held a claim against NSSI from May 1996 that remained unpaid on July 1, 2002, when NSSI filed its bankruptcy petition. He filed a proof of claim in the bankruptcy case. The court has entered an order allowing his claim. In addition, Dyer testified that DAX Technologies, an NSSI vendor partner, held a claim against NSSI from September 2000 that remained unpaid on the petition date. DAX filed a proof of claim in the bankruptcy case. The court has allowed the DAX claim. Dyer challenges transfers from NSSI to J&G beginning on February 25, 2000. NSSI had a creditor on that date who remained unpaid on the date of the bankruptcy petition. The substantial majority of the challenged transfers occurred after September 1, 2000. NSSI had at least two creditors on that date who remained unpaid on the date of the bankruptcy petition.

## **Insolvency**

The Bankruptcy Code defines insolvency as a "financial condition such that the sum of [the] entity's debts is greater than all of [its] property, at a fair valuation . . ." 11 U.S.C. § 101(32). Texas law parallels the Bankruptcy Code's approach to insolvency. Tex. Bus. & Com. Code Ann. § 24.003 (Vernon 2002).

-6-

Courts refer to this test as a balance sheet test, and engage in the "fair valuation" of the debts and property shown on the debtor's balance sheet. However, a fair valuation may not be equivalent to the book values assigned on a balance sheet.

To perform this test, the court makes a two-step analysis. The court must first determine whether the debtor was a "going concern" or was "on its deathbed." The court must then value the debtor's assets, depending on the status determined in the first inquiry, and apply the balance sheet test to determine whether the debtor was solvent.

For a debtor that was a going concern, the court would "determine the fair market price of the debtor's assets as if they had been sold as a unit, in a prudent manner, and within a reasonable time." As a going concern, the debtor would not likely face a forced sale. Accordingly, a fair market valuation best determines a fair market price.

The Fifth Circuit has instructed that the fair value of property is determined ". . . by 'estimating what the debtor's assets would realize if sold in a prudent manner in current market conditions.'" Brentwood Lexford, 292 B.R. at 268 (citations omitted).

Dale Dowell, the liquidating trust's accountant, testified that NSSI had been continually insolvent from January 2000 until the filing of its bankruptcy petition. Dowell assessed NSSI's solvency as a going concern. NSSI operated during that time

-7-

period. The Chapter 11 trustee sold NSSI as a going concern during the bankruptcy case.

Dowell testified that he examined a series of NSSI balance sheets from December 1999 to December 2001, all of which reported balance sheet insolvency. Dowell recognized that the balance sheets did not necessarily reflect going concern market values. Consequently, he testified that he adjusted certain balance sheet entries.

Dowell testified that accounts receivable constituted most of NSSI's assets on the balance sheet. He adjusted the accounts receivable based on an aging analysis to reflect that NSSI likely held uncollectible receivables. He testified that a prudent buyer would engage in an aging analysis of the accounts receivable. He compared NSSI to the experiences of a wide range of IT staffing companies, from those of comparable size to very large entities. He concluded that typically a five percent discount rate for collectablity would be applied. He found a ratio of 4.5 percent for collections to gross receipts. He then inferred that a prudent buyer of NSSI, considering its size and business, would apply a 2.7 percent discount rate to factor uncollectible receivables.

NSSI used a customized software program for its business. As a stand alone asset, Dowell testified that the software program had little market value. Its value depended on NSSI operating. The balance sheet attributed a stand alone value to

-8-

the software that could not be obtained in the market.  Dowell testified that he accordingly adjusted that value to reflect the use of the software with generating the going concern income.

Dowell made no other adjustments to the balance sheet assets.  Dowell testified that NSSI's liabilities on its balance sheet were all supported by payables and notes.

With these adjustments to the balance sheet, Dowell testified that NSSI had been insolvent on each date examined.  He testified that he searched NSSI's records for capital infusions or investments for the intervening days, and found none.  He inferred that NSSI had been insolvent on each intervening day.

Dowell also examined NSSI's records for evidence of a willing buyer of the debtor.  Dowell recognized that despite its insolvency, NSSI managed to maintain operations during the two and one half years before the bankruptcy filing.  Michael Logal confirmed that NSSI managed to continue to operate.

Zapendowski testified that he valued his shares of NSSI at $700,000, thereby projecting a $2.8 million value for NSSI's equity.  J&G posed questions to witnesses implying that NSSI had a bona fide offer to sell its stock at some point during the avoidance period for an amount exceeding its liabilities.  Dowell found no evidence of a bona fide offer.  J&G produced no such evidence.  Mere suggestions do not amount to a bona fide offer to purchase the debtor as a going concern by a willing buyer in the market.

Based on this evidence, Dyer has established that NSSI had been insolvent from January 2000 to the petition date.

## Value

Satisfaction of an antecedent debt of NSSI constitutes value in exchange for the transfers.  11 U.S.C. § 548(d)(2)(A); Tex. Bus. & Com. Code Ann. § 24.004 (Vernon 2002).  J&G provided legal services to NSSI.  NSSI's payment for those services satisfied an antecedent debt in two respects.  The payments satisfied the antecedent debt to J&G for services rendered.  Those services addressed claims against NSSI or against the Logals, for which NSSI had a contractual obligation to indemnify.  The elimination of that contractual obligation also satisfies an antecedent debt. The exception applies to services for the Logals for which NSSI would not have an obligation to indemnify.

On July 13, 1999, Blumberg and Zapendowski, alleging to be acting on behalf of NSSI, brought a law suit in Texas state court against the Logals.  Network Staffing Services, Inc. v. Michael P. Logal, Deborah V. Logal and Clark Glen Garret, case no. 99-5652-B, 44th Judicial District Court of Dallas, Texas.  NSSI asserted claims of breach of fiduciary duty, negligent misrepresentation, and breach of contract against the Logals. NSSI sought and obtained two temporary restraining orders against the Logals.  The Logals retained J&G to represent them in that litigation.

-10-

The second restraining order excluded the Logals from the business and premises of NSSI. The Logals complied with that order. But, as a result, NSSI's employees did not report for work and NSSI's factoring company declined to finance its operations. Zapendowski had taken control of the operations. He agreed that Michael Logal should resume operational control, which he did.

The state court law suit was dismissed in the late summer of 1999.

On December 1, 1999, the Logals brought a law suit in federal court against Blumberg's corporation, Stasan, Inc. Michael P. Logal, Deborah V. Logal and Network Staffing Services, Inc. v. Stasan, Inc., case no. 3-99-CV-2796-G, United States District Court for the Northern District of Texas ("Stasan I"). J&G represented the Logals. In the meanwhile, Blumberg filed a law suit against NSSI in Florida. In Stasan I, the Logals sought a declaration that certain NSSI shares of stock held by Stasan were void.

Stasan moved to dismiss the law suit, claiming that NSSI was an indispensable party. NSSI then joined the law suit as a party plaintiff. NSSI retained J&G to represent it. Beginning in February 2000, NSSI paid J&G for legal services provided to NSSI and the Logals. Ted Daniel, the J&G partner in charge of the assignment, testified that the work for the Logals and for NSSI became so intertwined that the firm did not keep separate billing

-11-

records. The Logals and NSSI filed an amended complaint with NSSI as a plaintiff.

Stasan filed counter-claims against (a) the Logals for breach of fiduciary duty; (b) against NSSI for a declaration that Stasan's shares were valid, a declaration as to the composition of NSSI's board of directors, and for shareholder inspection pursuant to Texas and Florida law; and (c) against both the Logals and NSSI for damages and attorney's fees. Stasan sought injunctive relief and the appointment of a receiver to take control of NSSI.

As discussed further below, the defense of the breach of fiduciary duty claim against the Logals did not provide services to NSSI. Other than that, NSSI required legal services to defend claims relating to the appointment of a receiver, composition of its board of directors, inspections, damages, and attorney's fees. NSSI contracted with the Logals to indemnify them for their legal fees concerning the corporate governance issues.

The court granted a summary judgment declaring that Stasan held valid shares of stock of NSSI but that the Logals properly controlled the board of directors. Stasan withdrew its fiduciary duty claims against the Logals at a pretrial conference. Stasan also withdrew its inspection request under Florida law. The court denied the Texas inspection request after a trial. The court awarded Stasan no damages and no attorney's fees. The court did not appoint a receiver. Stasan appealed to the Fifth

Circuit.  The Circuit affirmed the district court.

On May 3, 2001, Stasan filed another law suit in federal court against NSSI and the Logals.  Stasan, Inc. v. Network Staffing Services, Inc., Michael P. Logal and Deborah V. Logal, case no. 3-01-CV-0842-D, United States District Court for the Northern District of Texas ("Stasan II").  Stasan filed the second federal suit before the Fifth Circuit decided the appeal in Stasan I.  In Stasan II, Stasan alleged claims against NSSI and the Logals for (a) conversion of Stasan's shares in NSSI; (b) declarations concerning transfers of shares to Logal, election of the NSSI board, and control of the NSSI board; and (c) specific performance of a shareholder agreement.  J&G defended both NSSI and the Logals.  The court ultimately dismissed Stasan II after the Fifth Circuit affirmed the district court's decision in Stasan I.

At trial of this adversary proceeding, at the conclusion of Dyer's case, the court granted partial findings to J&G, holding that NSSI required legal services in Stasan I and Stasan II, and related matters.  J&G provided legal services for NSSI.  NSSI partially paid for those legal services by transfers beginning in February 2000.  The satisfaction of an antecedent debt constitutes value.

As Daniel testified, because of the nature of the work on behalf of both the Logals and NSSI, J&G's time records cannot be separated to account for strictly NSSI work.  Consequently, the

-13-

court proceeded with the trial to determine the impact of the
work done for the Logals.

For the combined work, the court has applied a lodestar
analysis. Except in rare circumstances, a federal court
determines reasonable compensation by applying the lodestar
analysis. Pennsylvania v. Delaware Valley Citizens' Council for
Clean Air, 478 U.S. 546, 564 (1986). The court calculates the
lodestar by multiplying the reasonable number of hours expended
by the reasonable hourly rates. Hensley v. Eckerhart, 461 U.S.
424 (1983). The lodestar is presumed to establish a reasonable
fee unless specific evidence warrants an adjustment based upon
the Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th
Cir. 1974), factors. Delaware Valley, 478 U.S. at 554-55. The
attorney bears the burden of establishing the reasonableness of
its requested fees and expenses. In re Beverly Manufacturing
Corp., 841 F.2d 365, 371 (11th Cir. 1988). J&G has not provided
the court with an exhibit reflecting the total hours worked as
applied to NSSI nor with the blended hourly rate for the services
provided. J&G did, however, provide individual invoices as
exhibits detailing certain matters and the attorney rates used in
determining fees for those invoices. Dyer does not contend that
either the hours worked or the rates used to calculate the fees
were not reasonable.

The court turns to whether the Logals held a claim against
NSSI for indemnification. The Bankruptcy Code defines a "claim"

-14-

as a "right to payment," regardless of whether the right is
unliquidated, contingent or unmatured.  11 U.S.C. § 101(5).  The
Code defines a "debt" as "liability on a claim."  11 U.S.C.
§ 101(12).  For all practical purposes, the terms are synonymous.
See, Matter of Southmark Corp., 88 F.3d 311, 317 (5th Cir.
1997)("The terms 'debt' and 'claim' are coextensive.").  For
purposes of fraudulent conveyances, as stated above, the Code
defines "value" as "satisfaction . . . of a present or antecedent
debt of the debtor."  11 U.S.C. § 548(d)(2)(A).  Consequently, if
the Logals held a claim against NSSI for indemnification, legal
services provided by NSSI satisfied that claim, and would thereby
constitute value.

The parties recognize that only one set of executed NSSI
bylaws exist.  Those bylaws provide at Article VI, General
Provisions:

> **6.08 Indemnification.** The Company shall defend and
> indemnify each Director and Officer against all claims,
> liabilities, costs and expenses imposed upon or
> reasonably incurred by him in connection with any suit
> or proceeding or the settlement or compromise thereof,
> in which he may be involved by reason of his being or
> having been a director or an officer of the Company,
> except in relation to matters as to which he shall be
> adjudged or determined by a majority of other directors
> and shareholders to have been negligent in the
> performance of his duties or have engaged in misconduct
> in connection therewith.  The foregoing right of
> indemnification shall be in addition to any other
> rights to which any officer or director may be entitled
> under any law, agreement, bylaws or otherwise.
>
> Under this provision, with the exception of the cause of

-15-

action based on breach of fiduciary duty, the Logals would be indemnified for their costs and expenses for defending the claims alleged against them in Stasan I and Stasan II, which concern their actions as directors in connection with the corporate governance and shareholder control disputes, inspection disputes, receivership demand, conversion and other claims.

Zapendowski and Michael Logal both testified about the merger of Techniki Informatica and NSSI in 1996. As part of the merger, Zapendowski and the Logals intended to execute amended NSSI bylaws. That intention notwithstanding, NSSI's shareholders never executed the amended bylaws. Yet, Michael Logal presented the draft of the amended bylaws to this court with a declaration stating that they were the effective bylaws. Consequently, the parties dispute whether the amended bylaws govern the indemnification issue.

The amended bylaws contain more extensive indemnification provisions. Article V empowers NSSI to indemnify a director, officer, employee, or agent "who was or is a party to any proceeding (other than an action by, or in the right of, the corporation)." § 5.01(1). In addition, NSSI had the power to indemnify a director, officer, employee, or agent regarding a judgment provided the person acted in good faith and in a manner reasonably believed to be in the best interest of NSSI, as determined by a court of competent jurisdiction. § 5.01(2). On the other hand, to the extent that a director, officer, employee,

-16-

or agent of NSSI successfully defends a proceeding covered by §§ 5.01(1) and 5.01(2), "he shall be indemnified against such expenses actually and reasonably incurred by him in connection therewith." § 5.01(3). For indemnification requests under § 5.01(1) or § 5.01(2) not determined by a court, any indemnification "shall be made by" NSSI by majority vote of its board of directors or by independent legal counsel or by shareholder vote. § 5.01(4). In addition, if an officer or director provided an undertaking to NSSI, NSSI could advance costs and expenses before the disposition of the litigation.

Dyer contends that the amended bylaws govern and that neither a court, nor NSSI by board of directors vote, independent legal counsel, or shareholder vote, authorized any indemnification for the Stasan litigation. J&G responds that Dyer failed to establish that the amended bylaws had been adopted, Daniel's declaration notwithstanding. But, if applicable, J&G argues that the bylaws nevertheless authorize the indemnification.

Applying the amended bylaws, the Logals had a claim for indemnification, except for the breach of fiduciary duty cause of action. Other than the issue concerning the validity of Stasan's stock, the Logals were successful in the proceedings. Accordingly, NSSI had a mandatory obligation to indemnify them for their expenses. § 5.01(3)("director, officer . . .shall be indemnified. . ."). With regard to the stock validity issue, it

-17-

is more likely than not that NSSI would have authorized indemnification pursuant to § 5.01(4). The Logals and Michael Logal's mother were board members. The Logals had been successful in the corporate governance issue. The Logals controlled the majority of the stock. Even though the Logals would have been disqualified to vote on the indemnification as board members, their control would have lead to the likely authorization of the reimbursement of expenses by a shareholder vote. Under these circumstances, it is more likely than not that NSSI would have authorized reimbursement of expenses for the Logals for the Stasan stock validity issue.

Consequently, even under the amended bylaws, the Logals had an indemnification claim.

NSSI paid the Logals' legal fees regarding Stasan I and Stasan II and certain related matters. Payment of those expenses satisfied a present or antecedent debt of NSSI, thereby constituting value.

J&G has not established, however, that the indemnification claim would cover the breach of fiduciary duty claims. The original bylaws cover "all claims." The amended bylaws cover claims other than those by or in the right of the corporation. The breach of fiduciary duty claim is a derivative claim. Unlike the other claims, the fiduciary duty claim against the Logals does not clearly fall within the ambit of typically indemnified expenses.

-18-

David Yarbrough, a bankruptcy consultant, testified that
corporate bylaws commonly provide for officer and director
indemnification. But he did not address or testify that
corporations would commonly indemnify expenses related to
fiduciary duty disputes. With regard to fiduciary duty-related
legal services, J&G had to review and respond to the claim,
interview the Logals, conduct some investigation and discovery,
confer within the firm and with opposing counsel, and attend the
pretrial conference. The claim did not survive that conference.
While J&G has not provided a detailed billing by project
analysis, the court infers that J&G spent twenty hours on that
work. Because J&G has not supplied the court with a blended rate
for its total fees, the court applies the $375.00 per hour rate
that Daniel charged during a period of time for which the
services occurred. This rate compares favorably to the blended
rate applied to J&G during the recent Senior Living Properties
case. See, In re Senior Living Properties, LLC, Case No. 02-
34243-SAF-11, Doc. No. 2012, at 3 (Bankr. N.D. Tex. April 28,
2004). The court therefore finds that $7,500 did not cover the
satisfaction of a present or antecedent NSSI debt (twenty hours
times $375 per hour). The court finds that NSSI did not receive
reasonably equivalent value for that work; but did receive
reasonably equivalent value for the remainder of the work
performed as counsel for the Logals.

The parties dispute whether Michael Logal would have left

NSSI had NSSI not paid his legal fees. Because Logal had a claim against NSSI for most of his legal fees and because of the Code's definition of value, the court need not make findings concerning NSSI management to resolve the fraudulent conveyance claims.

The court does find, however, that although insolvent, NSSI was not engaged in nor was not about to be engaged in a business or transaction for which its assets remaining after payment of legal fees were unreasonably small nor that NSSI intended to incur or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

These findings cover both legal services provided by J&G and reimbursement of J&G's out of pocket expenses. Dyer did not present separate evidence to support avoiding transfers to pay for out of pocket expenses incurred by J&G on behalf of NSSI and the Logals. Dyer did not tie any particular expenses to the fiduciary duty claims against Michael Logal.

Based on these findings and conclusions, the court will dismiss the fraudulent conveyance claims except for $7,500. Dyer shall have a judgment avoiding the transfer of the $7,500.

### Preference

Dyer contends that the transfers of $68,183.80 should be avoided under 11 U.S.C. § 547(b). Dyer requests that the court enter a judgment for the avoided transfers under 11 U.S.C. § 550.

Section 547(b) provides, in pertinent part:

-20-

> Except as provided in subsection (c) of this section,
> the trustee may avoid any transfer of an interest of
> the debtor in property-
> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the
> debtor before such transfer was made;
> (3) made while the debtor was insolvent;
> (4) made-
> (A) on or within 90 days before the date of the filing of
> the petition; or
> (B) between ninety days and one year before the date of the
> filing of the petition, if such creditor at the time of such
> transfer was an insider; and
> (5) that enables such creditor to receive more than such
> creditor would receive if-
> (A) the case were a case under chapter 7 of this title;
> (B) the transfer had not been made; and
> (C) such creditor received payment of such debt to the
> extent provided by the provisions of this title.

11 U.S.C. § 547(b).

Dyer has established each of these elements. J&G has not
rebutted the presumption of insolvency. But even if J&G rebutted
the presumption, the court adopts the findings on insolvency made
above and finds NSSI insolvent during the preference period.
Dyer testified that J&G recovered more by the transfers that J&G
would recover in a hypothetical Chapter 7 case had the transfers
not been made.

Dyer testified that he expected to pay a dividend to
unsecured creditors between twenty to thirty cents on the dollar.
He further testified that the dividend rate would not
significantly change even if he recovered the entire $404,000 he
seeks in this adversary proceeding. For purposes of
§ 547(b)(5)(C), the court assumes a liquidation dividend of
thirty cents on the dollar with a recovery. J&G holds an allowed

-21-

claim of $22,000.  Dyer will likely pay between $4,400 and $6,600
on that claim (twenty to thirty percent).  J&G received a total
of $68,183.80 during the preference period.  For purposes of this
analysis, the court considers the entire amount received by J&G,
even though Dyer's recovery would be limited to the legal fee
component of $51,247.30.  In this case, J&G would receive between
$72,583.80 and $74,783.80 ($68,183.80 plus the 20 and 30 percent
calculation).  Had the transfer not been made, J&G would hold an
allowed claim of $90,183.80 ($68,183.80 plus the $22,000 allowed
claim in the case).  The liquidation dividend would have been
$27,055.14 (thirty percent of $90,183.80).  J&G therefore
received more than had the transfer not been made and the case
proceeded under Chapter 7 of the Code.

In the pretrial order, Dyer identified an issue of whether
11 U.S.C. § 547(c)(2) applies.  J&G did not renew that defense in
its section of the pretrial order nor argue the issue at trial.
For purposes of completeness, the court finds that the defense
does not apply.  NSSI made five payments to J&G by check during
the preference period.  The amount of the checks substantially
differed from the amounts commonly paid during the parties'
relationship beginning in December 1999.  Consequently, J&G did
not establish § 547(c)(2)(B).

J&G did pursue the defense of 11 U.S.C. § 547(c)(4) at
trial.  Dyer argued at trial that the defense could not be
pursued because J&G did not plead it as an affirmative defense.

-22-

But J&G included the defense in the pretrial order. Dyer did not object to the consideration of the defense in the pretrial order. Consequently, the court considers the defense.

Dyer may not avoid a preferential transfer if J&G "gave new value to or for the benefit of the debtor – (A) not secured by an otherwise unavoidable security interest; and (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of [J&G]." 11 U.S.C. § 547(c)(4). For the preference period, the court considers all the legal fees paid, $51,247.30. Following transfers on April 30, 2002, and June 11, 2002, J&G provided $7,860.47 worth of legal services. The invoices for those legal services were not secured by an otherwise unavoidable security interest. NSSI did not make an otherwise unavoidable transfer on account of those legal services. J&G has therefore established a credit of $7,860.47 to be applied against the preferential transfer. Dyer shall recover the net transfer of $44,922.33. The court notes for purposes of completeness that, because the fiduciary duty claim was outside of the preference period, the two avoidances are separably recoverable by Dyer.

### Order

Based on the foregoing,

**IT IS ORDERED** that a transfer of $7,500 from Network Staffing Services, Inc., to Jenkens & Gilchrist, P.C., is avoided

-23-

as a fraudulent transfer under federal and Texas law.

**IT IS FURTHER ORDERED** that transfers of $44,922.33 from
Network Staffing Services, Inc., to Jenkens & Gilchrist, P.C.,
are avoided as preferential transfers.

**IT IS FURTHER ORDERED** that Doug G. Dyer, as trustee of the
Network Staffing Services, Inc., Liquidating Trust, shall have a
judgment of $52,422.33 under 11 U.S.C. § 550, together with pre-
judgment interest of 2.16 percent from June 30, 2004, the date of
the filing of the adversary complaint, to entry of judgment, and
post judgment interest at the federal rate.

Counsel for Dyer shall submit a proposed final judgment
consistent with this order.

###END OF ORDER###